UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x
QINGDAO TANGBO GARMENTS CO., LTD.,

                         Plaintiff,                              17-cv-6992 (PKC)

         -against-                                               OPINION
                                                                 AND ORDER

PRG NOUVEAU, LLC, PARIGI GROUP LTD.,
PARIGI MMS HOLDINGS LLC, HARRY
SAUL TAWIL, MORRIS SROUR, MARCO
SROUR and STELLA JEMAL,

                         Defendants.
------------------------------------------------------------x

CASTEL, U.S.D.J.

         From 2011 to 2015, defendant Qingdao Tangbo Garments Co., Ltd. ("Qingdao")

manufactured and delivered items of children's clothing ordered by defendants Parigi Group Ltd.

("Parigi Group") and Parigi MMS Holdings LLC ("Parigi LLC").  The transactions were made

through purchase orders, in which the two Parigi entities ordered quantities and styles of clothing

and paid the invoices that accompanied Qingdao's shipments.

         In 2015, the Parigi entities stopped payment on Qingdao's invoices, with total

outstanding debt of approximately $1.1 million.  In October 2015, the Parigi Group and its

"affiliates" agreed to pay their outstanding debts to Qingdao, and resumed placing orders.

Thereafter, the two Parigi entities sold their inventories and brand licenses to defendant PRG

Nouveau, LLC ("PRG"), and no further payments were made on the outstanding balances owed.

Individual defendants Marco Srour, Morris Srour and Stella Jemal were all members and/or

officers of Parigi LLC, the Parigi Group and the newly-formed PRG.  In a subsequent letter-

agreement executed by PRG and its members, PRG agreed to assume more than $1.9 million of

the Parigi entities' debts to Qingdao. PRG also had direct discussions with Qingdao about the payment of the Parigi entities' debts, which Qingdao agreed to reduce to $1 million in exchange for twelve monthly payments from PRG. PRG paid three installments, then ceased paying.

In the First Amended Complaint (the "Complaint"), Qingdao asserts breach of contract claims against the Parigi Group and Parigi LLC, PRG, and individual defendants Marco Srour, Morris Srour, Harry Saul Tawil, and Stella Jemal. It also brings claims of constructive fraudulent conveyance against all defendants pursuant to New York Debtor and Creditor Law section 273, and a claim of actual fraudulent conveyance against all defendants pursuant to section 276 of the same statute. Subject matter jurisdiction is premised on diversity of citizenship between Qingdao, a citizen of China, and the defendants, who are all citizens of New York. (Compl't ¶ 17.)

Defendants move to dismiss the Complaint for failure to state a claim pursuant to Rules 12(b)(6) and 9(b), Fed. R. Civ. P. For the reasons that will be explained the motion will be granted as to all claims against defendant Tawil, but is otherwise denied.

BACKGROUND.

A. Qingdao's Business Dealings with the Parigi Entities.

Qingdao is an apparel manufacturer organized and located in China. (Compl't ¶¶ 2, 7.) Beginning in 2011, the Parigi Group and Parigi LLC submitted purchase orders for the manufacture and delivery of children's clothing by Qingdao. (Compl't ¶ 2.) The two Parigi entities are based in New York, and have overlapping ownership, management and office space. (Compl't ¶¶ 8-12, 14-16, 27.) Defendants Morris Srour and Marco Srour are allegedly members of Parigi LLC, and, along with defendant Stella Jemal, officers of the Parigi Group. (Compl't ¶¶ 14-16.)

The purchase orders that the Parigi entities sent to Qingdao listed styles and quantities of clothing to be manufactured and the agreed-upon purchase prices. (Compl't Ex. A.) After receiving a purchase order, Qingdao manufactured and shipped the clothing, which was accepted by the two Parigi entities in New York. (Compl't ¶ 2.) The two Parigi entities held licenses for children's clothes marketed under the brands DKNY, Penguin by Munsingwear and Lucky Brand. (Compl't ¶¶ 20-22.)

The Parigi entities placed orders with Qingdao from 2011 to 2015. (Compl't ¶ 40-42.) All invoices were paid in full through 2014. (Compl't ¶ 41.) Through 2015, the Parigi entities continued to place orders for children's apparel, and Qingdao alleges that it delivered the items with invoices listing an agreed-upon price. (Compl't ¶¶ 42-43.) However, beginning in 2015, the Parigi entities stopped paying the invoices. (Compl't ¶ 3.) By October 2015, the two Parigi entities had outstanding invoices with Qingdao in the amount of $1,156,292.10. (Compl't ¶ 45.)

Pursuant to an agreement of October 16, 2015, the Parigi Group "and each of its affiliates" agreed to repay Qingdao $1,156,292.10, with installments to be paid from December 31, 2015 through December 15, 2016. (Compl't ¶ 46 & Ex. B.) The Parigi Group and Parigi LLC then submitted new purchase orders to Qingdao. (Compl't ¶ 47.) According to the Complaint, however, the Parigi entities failed to make the agreed-upon payments, and defendant Morris Srour thereafter told Qingdao that the Parigi entities would be sold to defendant Harry Saul Tawil. (Compl't ¶¶ 49-50.)

B. The Sale of Assets to PRG.

Defendant PRG is a limited liability company formed in or around January 2016. (Compl't ¶ 51.) Its members include defendants Morris Srour, Marco Srour, Harry Saul Tawil,

and Stella Jemal. (Compl't ¶¶ 12, 51.) As noted, the Srour defendants were members of Parigi LLC, and, along with Jemal, were officers of the two Parigi entities. (Compl't ¶¶ 11, 14-16.)

After PRG's formation in January 2016, it accepted merchandise previously ordered from Qingdao by the Parigi entities. (Compl't ¶¶ 51, 54, 62.) PRG also shared office space with the Parigi entities. (Compl't ¶ 55.) According to the Complaint, PRG purchased inventory held by the two Parigi entities at 73% of cost, with no notice given to creditors of the Parigi entities. (Compl't ¶¶ 56, 60.) In addition to buying inventory, PRG also bought the Parigi entities' brand licenses for DKNY, Lucky Brand and Penguin by Munsingwear. (Compl't ¶¶ 63-65.) Rather than pay Qingdao, the Srour defendants and Jemal allegedly used the sales proceeds to pay down a loan to the Parigi Group by CIT Bank, N.A. on which they were personal guarantors. (Compl't ¶ 57.) PRG later resold the Parigi inventory to retailers at fair market value. (Compl't ¶ 58.)

The Complaint alleges that PRG agreed to assume the liabilities of the Parigi entities, including $1,973,000 that the Parigi Group owed to Qingdao. (Compl't ¶ 67.) In support of their motion to dismiss, defendants have submitted a letter-agreement of April 26, 2016, which is written on PRG letterhead and signed by the four individual defendants and by Marco Srour on behalf of PRG. (Lazarus Dec. Ex. C.) Under the agreement, Parigi Group agreed to sell certain assets, including brand licenses, to PRG for $4,800,000. (Docket # 40-3 at 5.) It also provided that PRG "shall assume" certain liabilities from the Parigi Group, specifically including debt to Qingdao in the amount of $1,973,000. (Id. at 6, 21.)

C. PRG's Draft Agreement with Qingdao to Repay the Parigi Entities' Debt.

On April 15, 2016, a representative of Qingdao met with defendant Tawil. (Compl't ¶ 70.) Tawil told Qingdao that PRG had acquired the relevant licenses for the Parigi

entities' apparel brands and that PRG would continue to do business with Qingdao if it agreed to reduce the amount of outstanding debt to $1 million.  (Compl't ¶¶ 71, 72.)  Qingdao agreed, and Tawil furnished a draft agreement whereby PRG would pay Qingdao $1 million over a 12-month period.  (Compl't ¶ 73.)  Qingdao's president executed the agreement in Tawil's presence, and Tawil stated that he would sign the agreement and deliver it to Qingdao.  (Compl't ¶¶ 74-75.)  However, the agreement was later delivered to Qingdao without a signature on behalf of PRG.  (Compl't ¶ 76.)

In August and September 2016, PRG wired three separate payments to Qingdao, each in the amount of $83,333, and Qingdao accepted the payments.  (Compl't ¶¶ 77-79.)  PRG paid no further installments.  (Compl't ¶¶ 80.)  On April 6, 2017, Qingdao told PRG that it had defaulted under the agreement, and PRG responded that the two Parigi entities were responsible for the debt.  (Compl't ¶¶ 81-82.)

D.  Overview of Qingdao's Claims.

Count One asserts a breach of contract claim against the Parigi Group and Parigi LLC for failing to make payments required by the invoices sent from Qingdao, and seeks damages of $1,722,906.  (Compl't ¶¶ 83-95.)  Count Two asserts a breach of contract claim against PRG in the same amount, alleging that it assumed the liabilities of the two Parigi entities through a written agreement, or, alternatively, is the alter ego of the two entities.  (Compl't ¶¶ 96-110.)  Count Three asserts a breach of contract claim against the four individual defendants in the same amount, asserting that they exercised complete dominion and control over the Parigi Group, Parigi LLC and PRG, and that the individual defendants are alter-egos of the three entities.  (Compl't ¶¶ 111-20.)  Count Four alleges constructive fraudulent transfer against all defendants pursuant to New York Debtor and Creditor Law § 273, and asserts that the individual

defendants caused the two Parigi entities to transfer assets to PRG without adequate compensation. (Compl't ¶¶ 121-27.) Count Five alleges fraudulent transfer against all defendants pursuant to New York Debtor and Creditor Law § 276, alleging that the individual defendants transferred assets from the Parigi entities to PRG with the intent of enriching themselves and evading Parigi creditors, including Qingdao. (Compl't ¶¶ 128-39.)

MOTION TO DISMISS STANDARD.

To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007)). Legal conclusions are not entitled to the presumption of truth, and a court assessing the sufficiency of a complaint disregards them. Iqbal, 556 U.S. at 678. Instead, the Court must examine only the well-pleaded factual allegations, if any, "and then determine whether they plausibly give rise to an entitlement to relief." Id. at 679. The Complaint must include non-conclusory factual allegations that "'nudge[ ]'" its claims "'across the line from conceivable to plausible.'" Id. at 680 (quoting Twombly, 550 U.S. at 570). On a motion to dismiss, a complaint "include[s] any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference . . . and documents that the plaintiffs either possessed or knew about and upon which they relied in bringing the suit." Rothman v. Gregor, 220 F.3d 81, 88 (2d Cir. 2000) (internal citations omitted).

Additionally, a claim of fraud must be alleged with the particularity required by Rule 9(b), Fed. R. Civ. P. Qingdao's claim of fraudulent transfer under section 276 of the New York Debtor and Creditor Law requires allegation of an intent to defraud a creditor on the part of a transferor, which must be pleaded with the particularity required of Rule 9(b). In re: Sharp

Int'l Corp., 403 F.3d 43, 56 (2d Cir. 2005). "Due to the difficulty of proving actual intent to hinder, delay, or defraud creditors, the pleader is allowed to rely on 'badges of fraud' to support his case, i.e., circumstances so commonly associated with fraudulent transfers that their presence gives rise to an inference of intent." Wall St. Assocs. v. Brodsky, 257 A.D.2d 526, 529 (1st Dep't 1999) (quotation marks omitted). "Among such circumstances are: a close relationship between the parties to the alleged fraudulent transaction; a questionable transfer not in the usual course of business; inadequacy of the consideration; the transferor's knowledge of the creditor's claim and the inability to pay it; and retention of control of the property by the transferor after the conveyance." Id.; see also JSC VTB Bank, etc. v. Mavlyanov, 154 A.D.3d 560, 562 (1st Dep't 2017) (applying factors).

DISCUSSION.

> I.     Defendants' Motion to Dismiss Count One Is Denied.

Parigi Group and Parigi LLC urge that the breach of contract claim against them should be dismissed because the Complaint fails to identify each of the purchase orders, invoices and letters of credit used in Qingdao's transactions with them. For the reasons that will be explained, the motion is denied.

Count One asserts breach of contract based on the Parigi entities' failure to make payment on the purchase orders submitted by the Parigi entities and the invoices that Qingdao sent in return. (Compl't ¶¶ 83-95.) It alleges that the parties' business relationship was conducted on a purchase-order basis and was not governed by a master contract. (Compl't ¶ 85.) It alleges that the Parigi entities submitted purchase orders for the manufacture and delivery of children's apparel, that the parties had a course of dealing through purchase orders and invoices, and that the defendants never cancelled the invoiced orders or made claims for chargebacks.

(Compl't ¶¶ 85-88, 94.)  Qingdao alleges that from January 2015 through April 2016, it

manufactured and delivered goods to the Parigi entities for a total invoiced price of $1,972,905,

of which $1,722,906 remains outstanding.  (Compl't ¶¶ 89-91.)  At Exhibit A, the Complaint

annexes a sample purchase order of September 18, 2015 from the Parigi Group to Qingdao for an

order of Lucky Brand apparel in the amount of $33,060.

"To plead breach of contract, the proponent must allege the existence of a

contract, the plaintiff's performance thereunder, the defendant's breach thereof, and resulting

damages."  Second Source Funding, LLC v. Yellowstone Capital, LLC, 144 A.D.3d 445, 445-46

(1st Dep't 2016).  To adequately allege a claim for breach of contract, a plaintiff must identify

the contract at issue, and may do so by identifying the contracts as a collection of purchase

orders.  See, e.g., Eastern Materials Corp. v. Mitsubishi Plastics Composites Am., Inc., 307 F.

Supp. 3d 52, 59-60 (E.D.N.Y. 2018) (Spatt, J.) (complaint adequately alleged that breach of

contract claim was directed toward provisions in a collection of purchase orders, as distinguished

from other agreements described in the complaint).

The breach of contract claim against the two Parigi entities is relatively

straightforward: it asserts that they submitted purchase orders for the manufacture and delivery

of apparel; that Qingdao performed by manufacturing and delivering the items, accompanied by

invoices; and that the Parigi entities breached the parties' agreements by failing to pay Qingdao,

resulting in damages.  (Compl't ¶¶ 85-95.)  These allegations give the Parigi entities notice of the

contracts at issue, Qingdao's claimed performance and the alleged breach.  Defendants

essentially urge that the date, items ordered, and amount due under each purchase order must be

identified in the Complaint.  (Def. Mem. at 8.)  But there is no ambiguity in the Complaint's

description of the underlying purchase orders and invoices, Qingdao's claimed performance, the breach alleged, and the damages claimed. See Second Source Funding, 144 A.D.3d at 445-46.

Defendants also assert that the Complaint includes certain allegations that reference the "defendants" as a group without distinguishing between them. (Def. Mem. at 6-7.) However, the Complaint sufficiently puts defendants on notice of the claims against them individually and the relevant factual allegations concerning them. Count One comfortably satisfies the notice pleading required of Rule 8, Fed. R. Civ. P.

The motion to dismiss will therefore be denied as to Count One.

II.     Defendants' Motion to Dismiss Count Two Is Denied.

A. The Complaint Plausibly Alleges that PRG Agreed to Assume the Debt Owed to Qingdao.

Count Two asserts a breach of contract claim against PRG based on the non-payment of the purchase orders described in Count One. First, it alleges that PRG assumed the debts of the two Parigi entities through a written agreement executed by the individual defendants, and, relatedly, that PRG breached an agreement with Qingdao based on its partial payment of the Parigi entities' debts. (Compl't ¶ 108.) Alternatively, it alleges that PRG is an alter ego of the two Parigi entities. (Compl't ¶ 109.)

In support of their motion, defendants have attached at Exhibit D to the Lazarus Declaration a copy of an April 26, 2016 letter-agreement between the individual defendants and PRG. The letter is executed by all four of the individual defendants and separately by Morris Srour on behalf of PRG. (Docket # 40-3 at 7.) Paragraph 108 of the Complaint refers to this agreement and its contents, and it is therefore properly considered as incorporated into the Complaint for purposes of this Rule 12(b)(6) motion. Rothman, 220 F.3d at 88.

The agreement states that PRG would purchase certain assets and brands from the Parigi Group for the price of $4,800,000. (Docket # 40-3 at 1, 5.) Under the heading "Assumed Liabilities," it states:

> In no event shall PRG assume or otherwise be responsible for, and Parigi and Marco Srour and Morris Srour, jointly and severally, shall indemnify PRG and Tawil from and against, any liability resulting from the operations of Parigi Group Ltd. or any other affiliated entity thereof . . . provided, however, that it is understood and agreed that PRG shall assume the Liabilities specifically identified as Assumed Liabilities on Exhibit G, including without limitation all liabilities under the License Agreements for the Srour Brands relating to the period after the Closing Date.

(Id. at 6.) Exhibit G is a table of "Assumed Liabilities" to 12 entities, including one to Qingdao in the amount of $1,973,000. (Id. at 21.) A separate column for the Qingdao entry states, "12 equal payments beginning 6/15." (Id.)

Defendants urge that the breach of contract claim against PRG should be dismissed because, under New York law, when one company sells its assets to another, the acquiror is not liable for the debts of the seller unless it agrees to assume those debts. See, e.g., Cargo Partner AG v. Albatrans, Inc., 352 F.3d 41, 45 (2d Cir. 2003). In this instance, however, PRG's agreement to purchase the assets of the Parigi Group expressly provided that it would acquire the Parigi Group's "Assumed Liabilities," and specifically listed debt to Qingdao in the amount of $1,973,000 as one such liability. By the express terms of the agreement referenced in the Complaint and submitted by defendants in opposition, PRG agreed to assume liability for the debts owed to Qingdao.

Defendants' motion to dismiss Count Two will therefore be denied.

B. The Complaint Plausibly Alleges that PRG's Partial Performance of the April 2016 Draft Agreement Reflects an Intent to Be Bound by the <u>Agreement.</u>

Alternatively, separate from PRG's purported agreement to assume the debts of the Parigi Group, the Complaint alleges that PRG and Qingdao agreed in April 2016 that PRG would pay the Parigi Group's debts in a reduced sum of $1,000,000 and that PRG partially performed before unilaterally stopping payment. (Compl't ¶¶ 73-80.) Thus, PRG would be liable in the alternative for breaching a separate, alleged agreement with Qingdao.

PRG allegedly furnished Qingdao with an April 15, 2016 draft agreement to pay the Parigi entities' debt, and, although PRG never executed that agreement, it partially performed under it by making three payments to Qingdao of $83,333 in August and September of 2016. (Compl't ¶¶ 73-80 & Lazarus Dec. Ex. D.) That draft agreement acknowledged $1,972,905 in debt from the Parigi Group to Qingdao, and provided that Qingdao would accept a reduced payment of $1,000,000 to be paid by PRG in twelve equal monthly installments. (Lazarus Dec. Ex. D.) It also provided that Qingdao would release all claims against PRG, its members and officers, among others. (<u>Id.</u>) The draft agreement provides that "[t]his Agreement shall not be effective unless and until signed by all parties." (<u>Id.</u>) It is signed on Qingdao's behalf by Yong Shi Vincent but is unsigned by PRG.[1] (<u>Id.</u>)

"[A]n unsigned contract may be enforceable, provided there is objective evidence establishing that the parties intended to be bound." <u>Flores v. Lower E. Side Serv. Ctr., Inc.</u>, 4 N.Y.3d 363, 369 (2005). "Partial performance by one party and the acceptance of such performance by another can satisfy this requirement." <u>Kimm v. Kyu Sung Cho</u>, 706 Fed. App'x 1, 2 (2d Cir. 2017) (summary order). For an unsigned agreement to be enforceable, the partial

---

[1] It appears that Mr. Yong, the signatory for Qingdao, executed the agreement on a signature line that was intended for PRG. (<u>See</u> <u>id.</u>)

performance by the party denying the existence of an agreement should be "unequivocally referable to that agreement . . . ." <u>Travis v. Fallani & Cohn</u>, 292 A.D.2d 242, 244 (1st Dep't 2002); <u>see also</u> <u>Dietze v. Patterson</u>, 1989 WL 31483, at *3 (S.D.N.Y. Mar. 30, 1989) (Mukasey, J.) (New York courts consider the cumulative performance of both parties as evidence of an intent to be bound).

Applying New York law, <u>R.G. Group, Inc. v. Horn & Hardart Co.</u>, 751 F.2d 69, 74-75 (2d Cir. 1984), recited a "list of factors courts have looked to in deciding whether the parties' words and deeds, within a given bargaining context, show an intent to be bound only by a written agreement." They include "a party's explicit statement that it reserves the right to be bound only when a written agreement is signed," partial performance and acceptance of that partial performance, "whether there was literally nothing left to negotiate or settle, so that all that remained to be done was to sign what had already been fully agreed to," and "whether the agreement concerns those complex and substantial business matters where requirements that contracts be in writing are the norm rather than the exception." <u>Id.</u> at 75-76. Courts evaluate these factors when deciding whether parties have agreed to be bound by a written agreement that has not been mutually executed. <u>See</u> <u>Attestor Value Master Fund v. Republic of Argentina</u>, 940 F.3d 825, 830 (2d Cir. 2019).

At the pleading stage, drawing every reasonable inference in favor of Qingdao as the non-movant, the Court concludes that the Complaint plausibly alleges that PRG and Qingdao agreed to be bound by the draft agreement of April 15, 2016. Of particular weight is the allegation that PRG partially performed by making three payments of $83,333 and that Qingdao accepted those payments. "[P]artial performance is an unmistakable signal that one party believes there is a contract; and the party who accepts performance signals, by that act, that it

also understands a contract to be in effect." R.G. Grp., 751 F.2d at 75-76. Here, PRG is alleged to have partially performed by paying installments on the debt of the Parigi Group, which is a separate entity. Based on the facts alleged in the Complaint, it is plausible that PRG's payment of the debts incurred by another party were "unequivocally referable" to the draft agreement. See Travis, 292 A.D.2d at 244. This weighs heavily in favor of the plausibility of Qingdao's breach of contract claim.

The Complaint also alleges that Qingdao's representative, Mr. Yong, executed the agreement in the presence of defendant Tawil, and that Tawil stated that he would execute the agreement and deliver it to Qingdao. (Compl't ¶¶ 74-75.) Accepting the truth of those factual allegations, the Complaint plausibly alleges that "there was literally nothing left to negotiate or settle, so that all that remained to be done was to sign what had already been fully agreed to." R.G. Grp., 751 F.2d at 75-76. At the pleading stage, there is no indication that the parties had reached an impasse on any term or were continuing to negotiate. See Attestor Value Master Fund, 940 F.3d at 830 (ongoing disputes over essential terms weighed against conclusion that parties had reached an agreement).

The Court also affords considerable weight to the draft agreement's provision that "[t]his Agreement shall not be effective unless and until signed by all parties," and the fact that it was not executed on PRG's behalf (Lazarus Dec. Ex. D; Compl't ¶ 76). See Attestor Value Master Fund, 940 F.3d at 830; R.G. Grp., 751 F.2d at 75-76. However, at the pleading stage, with no discovery or additional context for the parties' actions, the Court is unable to meaningfully weigh that factor against PRG's payments and Qingdao's acceptance of the payments. The issue is more properly adjudicated at summary judgment or before a trier of fact.

The Complaint plausibly alleges that PRG agreed to pay $1,000,000 of the Parigi entities' debt to Qingdao, and that it breached its promise to do so. Defendants' motion to dismiss Count Two will therefore be denied.

III.    Defendants' Motion to Dismiss Count Three Is Denied as to the Srour Defendants and Jemal, but Granted as to Tawil.

Count Three alleges a breach of contract claim against the four individual defendants. It asserts that the individual defendants were alter egos of the Parigi entities and PRG, and that the corporate veil should therefore be pierced to hold the individual defendants personally liable for the contractual debts owed to Qingdao. For the reasons that will be explained, Count Three will therefore be dismissed as to Tawil, but defendants' motion is otherwise denied.

"The doctrine of piercing the corporate veil is typically employed by a third party seeking to go behind the corporate existence in order to circumvent the limited liability of the owners and to hold them liable for some underlying corporate obligation." Morris v. New York State Dep't of Taxation & Fin., 82 N.Y.2d 135, 140-41 (1993). "Generally . . . piercing the corporate veil requires a showing that: (1) the owners exercised complete domination of the corporation in respect to the transaction attacked; and (2) that such domination was used to commit a fraud or wrong against the plaintiff which resulted in plaintiff's injury." Id. at 141. "Factors to be considered in determining whether the owner has abused the privilege of doing business in the corporate form include whether there was a failure to adhere to corporate formalities, inadequate capitalization, commingling of assets, and use of corporate funds for personal use." D'Mel & Assocs. v. Athco, Inc., 105 A.D.3d 451, 452 (1st Dep't 2013) (quotation marks omitted).

Where veil-piercing claims sound in fraud, the plaintiff must satisfy the heightened pleading standard of Rule 9(b); otherwise, the notice-pleading standard of Rule 8 applies.  See, e.g., United Feature Syndicate, Inc. v. Miller Features Syndicate, Inc., 216 F. Supp. 2d 198, 222-23 (S.D.N.Y. 2002) (Lynch, J.).  "[T]he heightened pleading standard in Fed. R. Civ. P. 9(b) need not be met in every case in which a claimant seeks to lift the corporate veil under New York law, since 'New York courts will disregard the veil ... either when there is fraud or when the corporation has been used as an alter ego,' and under the alter ego theory of liability, a veil-piercing claimant may prevail by 'identify[ing] some non-fraudulent 'wrong' attributable to the defendant's complete domination' of the corporation in question."  Id. at 223 (quoting Rolls-Royce Motor Cars, Inc. v. Schudroff, 929 F. Supp. 117, 121-22 (S.D.N.Y. 1996) (Mukasey, J.)). As explained by the First Department:

> Wrongdoing in this context does not necessarily require allegations of actual fraud.  While fraud certainly satisfies the wrongdoing requirement, other claims of inequity or malfeasance will also suffice.  Allegations that corporate funds were purposefully diverted to make it judgment proof or that a corporation was dissolved without making appropriate reserves for contingent liabilities are sufficient to satisfy the pleading requirement of wrongdoing which is necessary to pierce the corporate veil on an alter-ego theory.

Baby Phat Holding Co., LLC v. Kellwood Co., 123 A.D.3d 405, 407-08 (1st Dep't 2014).

Count Three asserts that the four individual defendants exercised complete dominion and control over the Parigi Group, Parigi LLC and PRG with respect to corporate decision-making and the transfer of assets.  (Compl't ¶¶ 112.)  It alleges that the individual defendants caused the Parigi entities to sell inventory to PRG at a price below fair market value and at 73% of their actual costs.  (Compl't ¶ 113.)  The Complaint alleges that the sales proceeds were then used to pay off a loan from CIT Bank, N.A., which was made to the Parigi Group and

personally guaranteed by defendants Marco Srour, Morris Srour and Jemal.  (Compl't ¶¶ 23-25, 114.)  The Complaint alleges that the individual defendants stripped the Parigi entities of assets to render them judgment proof, and injured Qingdao as a result.  (Compl't ¶¶ 116, 119.)

As noted, Marco Srour and Morris Srour are alleged to be the sole members of Parigi LLC, and to be officers and/or principals of the Parigi Group.  (Compl't ¶¶ 11, 14-15.) Jemal is not alleged to be a member of Parigi LLC, but is alleged to be an officer and/or principal of both Parigi LLC and the Parigi Group.  (Compl't ¶ 16.)  Defendant Tawil is not alleged to have had any position or ownership interest in the two Parigi entities.  (Compl't ¶¶ 11-16.)

The Complaint plausibly alleges that the Srour defendants and Jemal exercised complete domination and control over the Parigi entities, and that they used that domination to commit a wrong that injured Qingdao.  Morris, 82 N.Y.2d at 140-41.  Specifically, as officers of the Parigi entities and members of Parigi LLC, they allegedly arranged for the sale of assets held by the two entities to PRG, which had the effect of stripping their assets and frustrating Qingdao's ability to obtain payment on debts incurred by them.  The Complaint further alleges that the proceeds from the sale of the Parigi entities' assets went toward paying debt to CIT, which was personally guaranteed by the Srour defendants and Jemal.  The Complaint alleges that these transactions occurred without notice to creditors, including Qingdao.  (Compl't ¶ 60.) "Allegations that corporate funds were purposefully diverted to make it judgment proof or that a corporation was dissolved without making appropriate reserves for contingent liabilities are sufficient to satisfy the pleading requirement of wrongdoing which is necessary to pierce the corporate veil on an alter-ego theory."  Baby Phat Holding Co., 123 A.D.3d at 407-08.

However, the Complaint does not include allegations that plausibly describe an alter-ego relationship involving Tawil or PRG.  Tawil is alleged to own 50% of PRG, but the

Complaint does not allege that he had any role in the Parigi entities. (Compl't ¶ 52.) The

Complaint does not describe actions by Tawil that plausibly support piercing the corporate veil.

See D'Mel & Assocs., 105 A.D.3d at 452.

The Court therefore concludes that the Complaint plausibly alleges that Marco

Srour, Morris Srour and Stella Jemal are liable on a veil-piercing theory for breach of contract by

the two Parigi defendants. Count Three will be dismissed as to Tawil, but the motion to dismiss

Count Three is otherwise denied.

IV.    Defendants' Motion to Dismiss Count Four Is Granted as to Tawil but
       Otherwise Is Denied.

Count Four asserts a claim of constructive fraud against all defendants pursuant to

New York Debtor and Creditor Law section 273. (Compl't ¶¶ 121-27.) It alleges that the

individual defendants cause the two Parigi entities to transfer goods and licenses to PRG without

adequate consideration, which rendered the Parigi entities insolvent and caused injury to

Qingdao. (Compl't ¶¶ 121-27.)

"Every conveyance made and every obligation incurred by a person who is or will

be thereby rendered insolvent is fraudulent as to creditors without regard to his actual intent if

the conveyance is made or the obligation is incurred without a fair consideration." N.Y. Debt. &

Cred. Law § 273. "A fraudulent conveyance is a transfer made without fair consideration by a

debtor when he or she is insolvent or which renders him or her insolvent . . . ." Palermo Mason

Const., Inc. v. Aark Holding Corp., 300 A.D.2d 458, 460 (2d Dep't 2002). An intent to defraud

is not necessary to establish liability under section 273. Sklaroff v. Rosenberg, 125 F. Supp. 2d

67, 74 (S.D.N.Y. 2000) (Parker, J.).

"'Under New York law, a creditor may recover money damages against parties

who participate in the fraudulent transfer and are either transferees of the assets or beneficiaries

of the conveyance.'" Cadle Co. v. Newhouse, 74 Fed. App'x 152, 153 (2d Cir. 2003) (summary order) (quoting RTC Mortgage Trust 1995–S/N1 v. Sopher, 171 F. Supp. 2d 192, 201-02 (S.D.N.Y. 2001) (Pauley, J.)). In RTC, following a bench trial, Judge Pauley found a constructive fraudulent conveyance under section 273 where an entity was rendered insolvent after it transferred its assets to a related entity without fair consideration, leaving it unable to pay its debts as they became due. 161 F. Supp. 2d at 199-200.

Here, the Complaint alleges that the Parigi entities transferred and assigned assets and licenses to PRG without adequate consideration, at a price of 73% of the cost of the goods. (Compl't ¶¶ 56, 125.) It alleges that, following the sale, Morris Srour told Qingdao that the Parigi entities were insolvent and would not pay for outstanding invoices. (Compl't ¶ 69.) The Complaint also describes significant overlap in the ownership and management of the Parigi entities and PRG, specifically including the Srour defendants and Jemal. (Compl't ¶¶ 11-12, 14-16.)

The Complaint includes facts sufficient to allege a claim of constructive fraudulent transfer between the two Parigi entities and PRG. It alleges that the Parigi entities were rendered insolvent by transferring assets to PRG without adequate consideration, leaving Qingdao unable to collect on its debts. As noted, a creditor like Qingdao may seek recovery from both the transferor and transferee in such a transaction. Cadle, 74 Fed. App'x at 153.

In support of their motion, defendants urge that PRG paid a fair market price for the inventory and licenses it acquired, and that the price reflected PRG's assumption of certain liabilities from the Parigi entities. Defendants' memorandum represents that PRG paid $4,800,000 for inventory worth more than $11,000,000 in light of those liabilities, which is significantly less than the 73% of fair market value alleged in the Complaint. (Def. Mem. 16.)

The value of the transaction, and whether it provided for adequate consideration, is beyond the scope of the pleadings and cannot be resolved on a motion to dismiss.

As to the individual defendants, the corporate veil may be pierced on a claim of constructive fraudulent conveyance if a plaintiff can demonstrate "that defendant owners exercised complete domination of the corporation with respect to the transaction under attack, and that such domination was used to commit a fraud or wrong against plaintiff, resulting in injury." Fisher v. Zaks, 48 A.D.3d 251, 251 (1st Dep't 2008). For the reasons already discussed as to Count Three, the Complaint plausibly alleges that the Srour defendants and Jemal exercised complete domination and control over the two Parigi entities, and that they transferred assets out of those entities, with the effect of leaving Qingdao unable to collect on its debts. Accordingly, the Complaint plausibly alleges a claim of constructive fraudulent transfer against Marco Srour, Morris Srour and Jemal.

Although Count Four is nominally brought against all defendants, it includes no allegations that describe defendant Tawil's participation in the transaction. The claim against Tawil will therefore be dismissed.

Defendants' motion to dismiss Count Four will therefore be granted as to Tawil, but otherwise denied.

V.     Defendants' Motion to Dismiss Count Five Is Granted as to Tawil but
       Otherwise Denied.

Count Five asserts a claim of actual fraudulent conveyance against all defendants pursuant to New York Debtor and Creditor Law section 276. (Compl't ¶¶ 128-39.) It alleges that from December 2015 through September 2016, the individual defendants enacted a scheme to defraud Qingdao and other creditors by transferring assets from the Parigi entities to PRG. (Compl't ¶ 129.) It alleges that the individual defendants caused the Parigi entities to purchase

and receive goods from Qingdao, did not pay for the goods, then arranged to sell inventory to PRG for less than fair-market value. (Compl't ¶¶ 130-32.) It alleges that the individual defendants all owned an interest in PRG and that all were aware of the outstanding debts owed to Qingdao. (Compl't ¶¶ 132-33.) The fraud claim states that after the asset sale to PRG, the proceeds paid the Parigi Group's debts personality guaranteed by the Srour defendants and Jemal. (Compl't ¶ 134.) It alleges that PRG then resold the inventory at fair-market value to retailers. (Compl't ¶ 135.)

"Every conveyance made and every obligation incurred with actual intent, as distinguished from intent presumed in law, to hinder, delay, or defraud either present or future creditors, is fraudulent as to both present and future creditors." N.Y. Debt. & Cred. Law § 276. "To prove actual fraud under § 276, a creditor must show intent to defraud on the part of the transferor. Where actual intent to defraud creditors is proven, the conveyance will be set aside regardless of the adequacy of consideration given. As 'actual intent to hinder, delay, or defraud' constitutes fraud, it must be pled with specificity, as required by Fed. R. Civ. P. 9(b)." In re Sharp Int'l Corp., 403 F.3d at 56 (citations, quotation marks and alterations omitted).

"Due to the difficulty of proving actual intent to hinder, delay, or defraud creditors, the pleader is allowed to rely on 'badges of fraud' to support his case, i.e., circumstances so commonly associated with fraudulent transfers that their presence gives rise to an inference of intent." Wall St. Assocs. v. Brodsky, 257 A.D.2d 526, 529 (1st Dep't 1999) (quotation marks omitted). "Among such circumstances are: a close relationship between the parties to the alleged fraudulent transaction; a questionable transfer not in the usual course of business; inadequacy of the consideration; the transferor's knowledge of the creditor's claim and the inability to pay it; and retention of control of the property by the transferor after the

conveyance." Id.; see also JSC VTB Bank, etc. v. Mavlyanov, 154 A.D.3d 560, 562 (1st Dep't 2017) (applying factors); RTC Mortgage Trust, 171 F. Supp. 2d at 201.

In RTC Mortgage Trust, Judge Pauley found that plaintiffs had proven actual fraudulent conveyance where there was a close temporal nexus between the entity's transfer of assets and its default on payment commitments, and where the transfer was made between related entities without adequate consideration, among other things. Id. The transfer had the effect of continuing the transferor's business under a different guise, unencumbered by its prior debt. Id.

Here, the Complaint has alleged facts that include the badges of fraud required to satisfy the particularity requirement of Rule 9(b). It describes common management and ownership between the Parigi entities and PRG; the sale of all Parigi inventory, including brand licenses, from the Parigi entities to PRG, which is not a transaction in the usual course of business; inadequate consideration for PRG's purchase of the Parigi inventory; knowledge on the part of the Parigi entities, as transferors, of Qingdao's claim; and substantial retention of control by the Srour defendants and Jemal following the transfer to PRG. See Brodsky, 257 A.D.2d at 529; JSC, 154 A.D.3d at 562.

Defendants' motion to dismiss principally urges that the Complaint fails to state a claim of fraud because it does not identify with particularity any specific statements alleged to be fraudulent or those statements' speakers. But this argument confuses a claim of fraudulent misrepresentation with a claim of fraudulent conveyance. See, e.g., In re Fiber Optek Interconnect Corp., 2011 WL 1197941, at *6-7 (S.D.N.Y. Mar. 31, 2011) (distinguishing fraudulent conveyance and fraudulent misrepresentations) (Holwell, J.). Count Five is not directed to false statements, but is instead to the conveyance of assets under section 276. The

Court concludes that the Complaint has identified the badges of fraud with the particularity required of Rule 9(b).

However, as to Tawil, the Complaint does not allege conduct that describes with particularity any badges of fraud that are attributable to him. While he held a substantial ownership interest in PRG, the Complaint does not allege that he was involved in the two Parigi entities or explain why he would have an intent to frustrate creditors of the Parigi entities by transferring assets to PRG.

Defendants' motion to dismiss Count Five will therefore be granted as to Tawil, but otherwise denied.

CONCLUSION.

For the reasons explained, defendants' motion to dismiss is GRANTED as to all claims asserted against Harry Saul Tawil, but is otherwise DENIED.

The Clerk is directed to terminate the motion. (Docket # 38.)

SO ORDERED.

P. Kevin Castel
United States District Judge

Dated: New York, New York
         March 24, 2020